McNULTY LAW FIRM
827 Moraga Drive
Los Angeles, CA 90049
Phone: (310) 471-2707
Fax: (310) 472-7014
Peter J. McNulty, Esq./SBN: 89660

FILED

2010 FEB 11 PH 2: 57

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT COURT OF CALIFORNIA

WESTERN DIVISION

UNITED STATES OF AMERICA, *ex rel.*, SHELBY EIDSON

                *Plaintiffs,*

vs.

AURORA LAS ENCINAS, LLC, CALIFORNIA MENTAL HEALTH CARE NETWORK – LOS ANGELES, LLC, SIGNATURE HEALTHCARE SERVICES, LLC, PASADENA OAKS, LLC, PASADENA OAKS PROPERTIES, LLC, PASADENA LAS ENCINAS HEALTHCARE, LLC, PASADENA LIFE PROPERTIES, LLC, VISTA LIFE PROPERTIES, LLC, AURORA LAS ENCINAS PHARMACY, INC., SOON K. KIM, M.D., ERIC KIM, LINDA PARKS, and P.BLAIR STAM, jointly and severally,

                *Defendants*

CV10 1031 MMM (RZx)

CASE NO.:

**FALSE CLAIMS COMPLAINT PURSUANT TO 31 U.S.C. §3729 ET SEQ; FILED UNDER SEAL**

**JURY TRIAL DEMANDED**

**COMES NOW** Plaintiff United States of America ("USA") and Qui Tam

Plaintiff Shelby Eidson ("Ms. Eidson") and file this complaint under the False

1

Claims Act, 31 U.S.C. §§ 3729 - 3733 (the "FCA") against Defendant Aurora Las Encinas, LLC, Defendant California Mental Health Care Network – Los Angeles, LLC, Defendant Signature Healthcare Services, LLC, Defendant Pasadena Oaks, LLC, Defendant Pasadena Oaks Properties, LLC, Defendant Pasadena Las Encinas Healthcare, LLC, Defendant Pasadena Life Properties, LLC, Defendant Vista Life Properties, LLC, Defendant Aurora Las Encinas Pharmacy, Inc., Defendant Soon K. Kim, M.D., Defendant Eric Kim, Defendant Linda Parks, and Defendant P. Blair Stam, (collectively referred to as "Defendants").

## I. INTRODUCTION

1.      This is an action to recover damages and civil penalties on behalf of the United States of America arising from false statements and claims made and presented by Defendants in violation of the Federal False Claims Act 31 U.S.C. § 3729, *et sequitur*, as amended ("The Act").

2.      Defendants' "False Claims" scheme is simple and pervasive.  Upon admission of a patient into Aurora Las Encinas, LLC (hereinafter referred to as the "Hospital"), the Defendants establish a comprehensive treatment plan.  The Defendants present claims for payment to the United States Government (Medicare and Medicaid) based on the comprehensive treatment plan.  The treatment described in the treatment plan and billed to the United States Government is <u>not</u> provided to the patient.  The Defendants instruct, direct, and force the staff (from

physician to social worker) to minimize the care and treatment the patient receives. The Defendants bill the United States Government for comprehensive, high-quality care, but deliver minimal, substandard care. The patient's bills (False Claims) are high, but the cost of the substandard care actually provided is low. Defendants realize huge profits by billing for care and treatment never rendered. Unfortunately, the patients who need the care do not receive the care and suffer injuries and death as a result of Defendants' denial of necessary care.

3.      This action seeks to recover damages and civil penalties arising from Defendants' presentation of false claims, records, and statements to the United States Government. Plaintiff also seeks damages arising from Defendants' false claims presented to the Medicare programs for services not rendered, for cases in which Defendants hospitalize patients and there is no medical necessity, and for Defendants' failure to meet Medicare "Conditions of Participation" required for reimbursement and falsifying documents concerning compliance.

4.      In 1965, Congress enacted Title XVIII of the Social Security Act ("Medicare") to pay for cost of certain services and care. Medicaid was also created in 1965 by Title XIX of the Social Security Act. Medicaid is a state and federal assistance program that provides payment of medical expenses for low-income patients. The United States Government and the States participating in the Medicaid program share responsibility for its funding. The Civilian Health and

Medical Program of the Uniformed Services ("CHAMPUS") is a program of medical insurance benefits provided by the United States Government to individuals with family affiliations to the military.  The Medicare and Medicaid Programs, as well as other federally-funded health care initiatives, are administered by the Centers for Medicare and Medicaid Services ("CMS") of the Department of Health and Human Services.  CMS was previously known as the Health Care Financing Administration or HCFA.

5.      Medicare reimburses hospitals for reasonable costs that are appropriate, necessary, and related to patient care.  The program has a set of cost reimbursement criteria used to determine whether costs submitted meet the definition of reasonable costs.  Hospitals submit cost reports to Medicare annually.  The cost reports are the basis for determining the facilities' reasonable costs.

6.      In addition to the Medicare and Medicaid programs ("Programs"), the Hospital has contracts with federally-funded military plans such as TriCare and state-funded plans such as Medi-Cal (California's Medicaid program).

## THE PARTIES

### Plaintiffs

7.      The **United States of America** has created and provides continuing funding for a variety of health care payment programs including, but not limited to, the Programs.  The Programs provide funding for medically necessary health care

services and for reasonable fees and costs attendant with the delivery of those services by participating providers to persons qualified for benefits under the Programs, including, but not limited to, persons who are aged, infirm, and/or impoverished. Health care services covered under the Programs include both inpatient and outpatient mental health services.

8.     **Shelby Eidson** ("Ms. Eidson") is an individual who resides in the City of Los Angeles, County of Los Angeles, State of California. Ms. Eidson is a current employee of the Hospital. Ms. Eidson has been employed at Aurora Las Encinas Hospital since August 2005 as a Mental Health Worker. Ms. Eidson is directly involved in the care and treatment of patients suffering from a wide variety of mental health issues, including chemical dependency.

As a direct result of her work at the Hospital, she has personal knowledge concerning the treatment practices and the Defendants' illegal scheme to present false claims and false reports and licensing documents to the Government. Ms. Eidson has personal knowledge of the fraudulent practices and has provided documentary evidence demonstrating the fraud. Ms. Eidson is an "original source" pursuant to 31 U.S.C. § 3730(e)(4)(B), because she has direct personal and independent knowledge of the facts alleged herein.

<u>Defendants</u>

9.      Aurora Las Encinas, LLC ("Hospital") is a California-based limited liability company that operates as Aurora Las Encinas Hospital, a private psychiatric facility that treats patients suffering from mental illness and addiction. The Hospital is located in the City of Pasadena, County of Los Angeles, State of California. The Hospital has been doing business as Aurora Las Encinas, LLC since January 9, 2003. The current CEO of the Hospital is Jerry Conway; the current Chief Financial Officer is Michelle Blazek; the current Director of Nursing is Diane Hobbs; the current head of Two South and Two East is Dr. Timothy Pylko; and the current Medical Director is Dr. Daniel Suzuki. At all times relevant hereto, Defendant Soon K. Kim, M.D. has held more than 50% of the membership interest in the Hospital.

The Hospital on its website states its "mission" is to provide the finest care and safe, ethical, and high-quality mental health and addiction medicine treatment to individuals and families in need. The Hospital states it is responsible for appropriate and ethical management of its finances; provides safe and quality care by competent staff; and is a teaching institution that provides education and training to professionals.

The Hospital has collected approximately $50,000,000.00 from federal and state contracts since it was purchased by Defendant Soon K. Kim,

6

M.D.  Upon information and belief, the Defendants have siphoned so much money out of the Hospital that the Hospital has been unable to meet its operating costs. 2007 financial statements show the Hospital's total revenue for that year was approximately $35 million.  In 2007, the Hospital was operated at a loss of approximately $2.5 million.  For five of the years since Dr. Kim purchased the Hospital in 2003, the records show that the Hospital has been operating at a loss. Dr. Kim has drained assets from the Hospital and cut critical services for patients and employees.

The financial mismanagement and cuts in critical services led to dangerous staffing ratios, employee injuries, patient deaths, and civil lawsuits. Since 2003, there have been eight deaths of Hospital patients and several rapes, including the rape of a 14-year-old patient by another patient at the Hospital.

10.     **California Mental Health Care Network – Los Angeles, LLC** d/b/a Aurora Behavioral Health, Pasadena Mental Health, and Pasadena Mental Health Network (collectively referred to as the "Network") is a Michigan-based limited liability company with its registered agent (Defendant P. Blair Stam) in the City of Corona, County of Riverside, State of California.  At all times relevant hereto, the Network and its subsidiaries owned facilities utilized by the Hospital to provide mental health care services.  According to the 2007 Medicare Cost Report statement submitted by the Hospital, the Network operates a Real Estate

Investment Trust (REIT).  Upon information and belief, California Mental Health Care Network, Aurora Behavioral Health, Pasadena Mental Health, and Pasadena Mental Health Network and all their subsidiaries are solely owned by Defendant Soon K. Kim, M.D.

11.    **Signature Healthcare Services, LLC** ("Signature") is a Michigan-based limited liability company with its principal place of business in the City of Corona, County of Riverside, State of California.  Signature is, and at all times relevant hereto has been, the manager of the Hospital pursuant to contract.  Upon information and belief, Signature is owned by Defendant Soon K. Kim, M.D., by members of Dr. Kim's immediate family, and/or by corporations, trusts, or partnerships controlled by Dr. Kim and/or members of Dr. Kim's immediate family.

12.    **Pasadena Oaks, LLC** ("The Oaks") is a California-based limited liability company located in the City of Corona, County of Riverside, State of California.  The Oaks operates as an assisted-living facility for senior citizens on the grounds of the Hospital in the City of Pasadena, County of Los Angeles, State of California.  Upon information and belief, Defendant Soon K. Kim, M.D. owns more than 51% of the membership interest in The Oaks.

13.    **Soon K. Kim, M.D.** ("Dr. Kim") is a psychiatrist whose residences include a home on the grounds of the Hospital in the City of Pasadena and a home

COMPLAINT

in the City of Dana Point, County of Orange, State of California, all in the Central District of California.  Dr. Kim owns more than 51% percent of the stock and/or membership interest in the Hospital, Signature, the Network, and the Oaks.  Dr. Kim has effective control of each.

14.     **P. Blair Stam** ("Mr. Stam") is the Chairman of the Board of Directors at the Hospital and Vice President of Signature.  Mr. Stam is the Registered Agent for the companies that comprise the Network and The Oaks.  Mr. Stam is also the Registered Agent for Pasadena Oaks Properties, LLC, Pasadena Las Encinas Healthcare, LLC, Pasadena Life Properties, LLC, and Vista Life Properties, LLC. Mr. Stam was formerly the Chief Operating Officer at the Hospital.  Mr. Stam also holds or has held positions in at least twenty companies affiliated with Dr. Kim.  A number of employees of the Hospital approached Mr. Stam to complain about the problems regarding denial of prescribed care and treatment described below.  Upon information and belief, Mr. Stam resides in the City of Corona, County of Riverside, State of California.

15.     **Linda Parks**, also known as Linda Pitman Parks ("Ms. Parks"), is the former Chief Executive Officer of the Hospital.  Many employees of the Hospital approached Ms. Parks to complain about the problems regarding denial of prescribed care and treatment described below.  Upon information and belief, Ms. Parks resides in the City of Riverside, County of Riverside, State of California.

16.        **Pasadena Oaks Properties, LLC; Pasadena Las Encinas Healthcare, LLC; Pasadena Life Properties, LLC; Vista Life Properties, LLC; and Aurora Las Encinas Pharmacy, Inc.:**   These are all entities owned and/or controlled by Dr. Kim.  Dr. Kim owns and controls many interconnected entities through which he funnels large sums of money Hospital obtains from false claims submitted to Medicare and Medicaid.

## II. <u>JURISDICTION AND VENUE</u>

17.        This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3730, which specifically confers jurisdiction on this Court for actions brought under the FCA.

18.        This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a), which provides that "[a]ny action under section 3730 may be brought in any judicial district in which the defendant or, in the case of multiple defendants, any one defendant can be found, resides, transacts business, or in which any act proscribed by section 3729 occurred."  Section 3732(a) also authorizes nationwide service of process.  During the relevant period of time, Defendants transacted extensive business in this judicial district and throughout the State of California and submitted false claims to the USA in California within the meaning of 31 U.S.C. § 3729.

COMPLAINT

19.     Venue is proper in this district pursuant to 31 U.S.C. § 3732(a), because the Defendants can be found in, reside in, and transact extensive business in this district and throughout the State of California and because many of the violations of 31 U.S.C. § 3729 described herein occurred within this judicial district.

### III.    VIOLATIONS OF THE MEDICARE "CONDITIONS OF PARTICIPATION"

20.     An entity must meet the Medicare "Conditions of Participation" in order to begin and continue to participate in the Medicare and Medi-Cal programs. 42 C.F.R. § 482.60.  The Hospital regularly fails to meet the following "Conditions of Participation:"

a.  **42 C.F.R. § 482.11 Compliance with Federal, State and Local Laws:**

- The Hospital routinely violates the Emergency Medical Treatment and Active Labor Act of 1986 ("EMTALA").

- The Hospital violates a patient's right to participate in their treatment plan (42 C.F.R. § 482.13) by failing to provide language translation services to patients.  Hospital has been cited by CMS for this violation.

- Defendants have falsified licensing and reporting documents provided to the State and the Programs.

11

- Dr. Kim and other officers have made material misrepresentations and false statements concerning the operation and management of the Hospital.  The Hospital made false statements on the Applications for Facility License.  The license application requires the Hospital to disclose if the facility is operated under a management contract. California Health and Safety Code § 1267.5(a)(3)(A).

**b.  42  C.F.R. § 482.23 Nursing Services and 42 C.F.R. § 482.62:**

- The Hospital fails to provide adequate nurses to care for patients. Hospital allows Licensed Vocational Nurses ("LVNs") to staff units which required Registered Nurses ("RNs"), in violation of Medicare regulations.

- Hospital nursing staff sleeps in patient beds during their shifts.  A memo from Diane Hobbs, Director of Nursing, confirmed that staff was sleeping in patient beds.

- The Hospital routinely fails to provide adequate numbers of RNs to care for the patients, in violation of Medicare regulations.  It is not uncommon for units holding up to 20 patients to be staffed by only one (1) mental health worker who is expected to monitor, collect

COMPLAINT

vital signs, conduct therapeutic groups, and respond to emergencies.

- The Hospital regularly fails to provide the nursing staff the tools and equipment necessary to do their job (blood pressure cuffs, stethoscopes, thermometers, etc).

- The Hospital provides needles without a safety lock.  Some of the nurses have resorted to buying their own needles.

- The Hospital fails to adequately staff the facility with housekeeping and maintenance personnel.  Housekeepers are provided on premises only between 7 a.m. and 3 p.m.  In the evenings, the nursing staff is required to clean rooms and make beds but do not have access to sanitizing and cleaning products.

- The Hospital fails to provide sinks in all bathrooms so that staff members can wash their hands.

- Patients with contagious conditions (crabs, lice, MRSA, etc.) are not properly quarantined or isolated from the rest of the population.  Sewage is constantly leaking in patient care areas.

- Defendants overrule doctors' orders for 1:1 staff/patient ratio.  At the direction of the Defendants, the Director of Nursing (Diane

COMPLAINT

Hobbs) removes patients from 1:1 status and does <u>not</u> notify the patients' physicians.

c.  42 C.F.R. § 482.43 Discharge Planning:

- Discharge Planning is almost nonexistent at the Hospital.  Upon discharge, homeless indigent patients are given $1.25 for bus fare to a local shelter.  The patients are "dumped" into a shelter only to be readmitted to the Hospital within days, weeks, or months of discharge.

- The lack of Discharge Planning and the lack of Utilization Review ("UR") result in patients remaining hospitalized for extended periods of time when it is not medically necessary.

d.  42 C.F.R. § 482.30 Utilization Review:

- The Hospital does not have a proper UR program, in violation of Medicare regulations.  The Hospital has essentially eliminated UR, which has resulted in longer and medically unnecessary patient stays in violation of Medicare regulations.

- The Hospital provides medically unnecessary treatment to patients in violation of Medicare regulations.  On some occasions, the Hospital attempts to "hide" the fact that patients are hospitalized during CMS inspections.  Some patients are "discharged" just prior

to CMS inspections and then readmitted immediately after the inspection.

- The lack of Discharge Planning and the lack of UR result in patients remaining hospitalized for extended periods of time when it is not medically necessary.

## IV.   SPECIFIC EXAMPLES OF FALSE CLAIMS AND FRAUDULENT CONDUCT

21.    To avoid the cost of education and training, the Hospital encourages and instructs the staff to cheat on annual competency tests.  The Defendants actually provide the answers to the test questions to avoid the time and cost of teaching and training the staff.  The Hospital intentionally marks (".") the correct answers on the test before giving the tests to staff.  The staff members "pass" the test with no instruction, study, or training, and then the Hospital falsely certifies successful performance on the examinations.

22.    The Hospital submits false claims for acute, involuntary "lock-down" care for patients who are actually hospitalized on open units.  The Hospital presents false claims for "therapeutic groups" that do not occur.  Some of the supposed "therapeutic groups" consist of watching television or trips outside the building to smoke.   Many staff members assigned to the therapeutic groups are untrained and unlicensed aides.

23.     The Hospital instructs employees to refuse admission to patients who do not have the ability to pay (such as through insurance, Medicare, or Medicaid). The Hospital also instructs employees to discharge patients who lose their ability to pay during their hospitalization.  One uninsured homeless patient presented to the Hospital acutely suicidal.  The Intake department placed the patient on involuntary hold.  When the Hospital determined that the patient did not have the ability to pay, the Hospital ordered the staff to cancel the hold and get the patient out of its lobby.

24.     The Hospital allowed patients to come and go freely to and from the Hospital with a "pass," particularly when the patient paid with cash (even if it came from a CMS contract).  The Hospital allowed cash patients to leave the Hospital to go to dinner with family and friends; to get tattoos; to attend theme parks; and to visit other cities.  On April 17, 2009, Dr. Steven Hytry (Director, Performance Improvement/Risk Management) distributed an internal memo prohibiting the practice of issuing patient "passes."  This memo stopped a practice that doctors and nurses should have known is completely inappropriate.  The "pass" practice is a violation of Medicare regulations.

25.     In 2006, a young man (Patient A.C.) was involved in an auto accident and became addicted to prescription medications.  On April 13, 2008 at 6:00 p.m., Patient A.C. voluntarily presented to the Hospital for treatment of addiction to

COMPLAINT

OxyContin and Xanax. His family and friends stayed with Patient A.C. until about 9:30 p.m. Between 8:15 p.m. and 11:00 p.m., the nurse administered multiple medications (muscle relaxer, pain medication, and medications to lower the heart rate and counter anxiety). Patient A.C. was found the next morning lying face up on a hardwood floor with vomit in his mouth. A nurse reported that Patient A.C. was "unarousable, cold & stiff to touch with a blue face," suggesting that he had been dead for quite some time. A mental health worker at the Hospital failed to conduct the patient checks every fifteen minutes as required and then falsified Patient A.C.'s record to indicate that the checks were completed. Patient A.C. was pronounced dead on April 14, 2008 at 7:45 a.m. from a "polymedications overdose". Nurse McMeekin is accused of "gross negligence" and "incompetence" in connection with Patient A.C.'s death. *In re Accusation Against Grace Anne McMeekin*, Board of Registered Nursing, State of California (Case No. 2010-300).

26.    Dr. Kim's mismanagement of the Hospital resulted in a number of injuries, deaths, and rapes:

a.    **Patient No. 17/A.C. (April 2008):** (patient overdose; see paragraph 26)

b.    **Patient No. 18 (2006):**   In 2006, Patient No. 18 was found dead in his bed at the Hospital after an adverse reaction to narcotic

medication.  Staff at the hospital failed to check his vital signs over an eight-hour period.

c.   **Patient No. 19 (March 2008):**  In March 2008, Patient No. 19 was admitted to the Hospital for drug addiction.  Another patient (former pharmaceutical representative) supplied Patient No. 19 with contraband prescription medications (Soma and Norco), resulting in a medication overdose.  Patient No. 19 was transferred to Huntington Hospital, where he died a day later.

d.   **Patient No. 20 (August 2008):** Patient No. 20, a UCLA graduate and bipolar patient, was admitted to the Hospital in 2008 for drug use and suicidal ideation.  Patient No. 20 was initially on suicide watch and then transferred to a substance abuse unit at the Hospital.   On July 31, 2008, the Hospital called Patient No. 20's family to say he was missing.  On August 1, 2008, Hospital employees found Patient No. 20 hanging from a wooden beam in an old shed on the Hospital campus.  The coroner stated Patient No. 20 used a white plastic bag to hang himself.

e.   **Patient No. 21 (August 2008):** A 16-year-old robbery suspect in juvenile custody was transferred to the Hospital.  In August 2008, the

COMPLAINT

robbery suspect broke out of his room and raped Patient No. 21, a 14-year-old Medi-Cal patient at the Hospital.

f.   **Patient No. 22 (July 2008):** In July 2008, Patient No. 22 was transferred to residential treatment at the Hospital. At the time, he was suffering from jaundice, hepatic encephalopathy, anemia, tachycardia, and pneumonia. When visiting, Patient No. 22's wife discovered him in an acutely ill state. Rather than call an ambulance, the Hospital instructed Patient No. 22's wife to take him to a medical hospital. Patient No. 22 died shortly after his arrival at the medical hospital.

g.   **Patient No. 23 (2004):** In 2004, Patient No. 23 was found dead at the Hospital after drowning himself in his bathtub.

h.   **Patient No. 24 (October 2004):** In October 2004, Patient No. 24 (18 years old) died after hospital employees restrained him for *two days*, not 3.5 *hours* as ordered.

27.   The Hospital presents false claims for care and treatment that is not provided to the patients. The Hospital also presents false and fraudulent claims for unnecessary care and treatment. A few specific examples of false claims are set forth below:

a.  Patient No. 1 (April 2009):  Patient No. 1 was admitted after trying to hurt herself (swallowing a battery).  The treating doctor put Patient No. 1 on 1:1 status, because she was a danger to herself.  On order from Linda Parks, Diane Hobbs (the Director of Nursing) removed Patient No. 1's 1:1 status without the knowledge or permission of her physician.  Within days, Patient No. 1 swallowed another battery and was taken to a local ER.  Upon her return to the Hospital, Patient No. 1 was left unattended.  She broke the bathroom mirror and swallowed pieces of the broken glass.  She was again transported to a local ER.  Patient No. 1 is a Medi-Cal recipient.  Upon information and belief, Defendants billed Medi-Cal for 1:1 status for Patient No. 1.

b.  **Patient No. 2 (March 2009):**   In March 2009, Patient No. 2 was taken off 1:1 status by Diane Hobbs (the Director of Nursing).  Patient No. 2 is known to engage in self-mutilation.  Patient No. 2 subsequently cut her arms with a sharp metal object found in the Adolescent Unit.  Patient No. 2 is a Medi-Cal recipient.  Upon information and belief, Defendants billed Medi-Cal for 1:1 status for Patient No. 2.

c.  **Patient No. 3 (June/July 2009):**  In June or July of 2009, Diane Hobbs removed Patient No. 3 from 1:1 status despite his classification

as a high-flight-risk patient.  Patient No. 3 subsequently got out through an emergency exit at the Hospital.  One Hospital employee attempted to stop Patient No. 3 from leaving.  Patient No. 3 threw the employee against a metal object during the scuffle and successfully escaped from the Hospital.  Upon information and belief, Defendants billed the United States Government for 1:1 status for Patient No. 3.

d.   **Patient No. 4 (January 2009):**  On January 7, 2009, Patient No. 4 was discharged in anticipation of a scheduled CMS inspection.  Patient No. 4 had been hospitalized numerous times over several months, originally for suicidal ideation.  Hospital administrators were ordered to "clean out" all patients who might be flagged by CMS (e.g. patients who had been previously flagged, patients hospitalized for long periods, and patients hospitalized without medical necessity, etc.).  Diane Hobbs signed off on the discharge paperwork, because the Charge Nurse and the Nursing Supervisor refused to do so.  Patient No. 4 reported that he was not ready to leave and used a razor to mutilate his face.  On the discharge survey, Patient No. 4 wrote that the Hospital would "regret discharging" him.  Patient No. 4 committed suicide by overdose within 24 hours of his discharge.  Upon information and belief, Defendants conspired to defraud CMS

21

by discharging patients to avoid detection by CMS inspectors of patients hospitalized without medical necessity.

e.    **Patient No. 5 (December 2008 – February 2009):**  The Hospital failed to provide Patient No. 5 (an Arabic speaker) with a translator. Patient No. 5 was originally admitted due to suicidal and homicidal ideation.  He reported on numerous occasions that his mental condition was deteriorating due to his inability to communicate.  CMS flagged the Hospital's failure to provide the patient with a translator. In anticipation of a CMS inspection, the Hospital transferred Patient No. 5 to the Villas Residential Treatment Center on Hospital grounds, because CMS would not inspect the Villas Residential Treatment Center.  The Villas Residential Treatment Center is only licensed to treat patients diagnosed with chemical dependency.  Patient No. 5 was returned to the Hospital after CMS inspectors left.  The hospital never provided Patient No. 5 with a translator.  Upon information and belief, Defendants conspired to defraud CMS in order to get CMS to pay their false and fraudulent claims by hiding Patient No. 5 to avoid his detection by CMS inspectors.

f.      **Patient No. 6 (December 2008 – February 2009):**  In November 2008, a CMS inspection determined that patients were hospitalized when not medically necessary.  Despite a lack of medical necessity, Patient No. 6 had been hospitalized for several months in a luxury unit at the Hospital billed out at $2,000.000 per day.  Patient No. 6 was discharged prior to two CMS inspections and readmitted immediately after each inspection.  Upon information and belief, Defendants conspired to defraud CMS in order to get CMS to pay their false and fraudulent claims relating to Patient No. 6's hospitalization without medical necessity.

g.      **Patient No. 7 (December 2008 – February 2009):**  In November 2008, a CMS inspection determined that patients were hospitalized when not medically necessary.  Patient No. 7 had been hospitalized for more than 300 days in a luxury unit billed out at $2,000.00 per day.  Patient No. 7 had sought hospitalization to meet the terms of probation and avoid incarceration.  Following citation for medically unnecessary care, the Hospital (Dr. Timothy Pylko) conspired to "hide" the fact that Patient No. 7 was hospitalized by discharging her just before subsequent inspections and readmitting her immediately after the inspections.  Upon information and belief, Defendants

conspired to defraud CMS in order to get CMS to pay their false and fraudulent claims relating to Patient No. 7's hospitalization without medical necessity.

h.     **Patient No. 8 (September 2009):**  In September 2009, Patient No. 8 escaped from a locked unit at the Hospital.  Patient No. 8 had been classified as high flight risk, but not placed on 1:1 status.  Patient No. 8 took a bus to Van Nuys, California.  Patient No. 8 is a Medi-Cal recipient.  Upon information and belief, Defendants billed Medi-Cal for 1:1 status for Patient No. 8.

i.     **Patient No. 9 (September 2009):**  In September 2009, Patient No. 9 smuggled a lighter into an acute locked unit (Mariah West).  She lit her sheets and bed on fire.  The fire department responded, and Mariah West was evacuated.  The Mariah West patients stayed at Two South overnight.  Despite the acute nature of Patient No. 9's illness, she was transferred to Two South days after starting the fire.  The Hospital has no fire safety training, and its fire detection system is regularly inoperative.

j.   **Patient No. 10 (September 2009):**  In September 2009, the Hospital placed Patient No. 10 (17 years old) in Two South, an adult unit.  The Hospital did this because it receives twice the money for an adult hospitalization it receives for an adolescent hospitalization.

k.   **Patient No. 11 (September 2009):**  In September 2009, the Hospital failed to provide Patient No. 11 (a deaf patient) with a sign language translator.  Patient No. 11 is a Medicare recipient.  Upon information and belief, Defendants failed to provide Patient No. 11 with a translator, thereby denying her the right to participate in her care and treatment.

l.   **Patient No. 12 (August/September 2009):**  On or about August 28, 2009, Patient No. 12 (a minor) was admitted to the Hospital after attempting to commit suicide (attempting to cut her throat).  Patient No. 12 was <u>not</u> placed on 1:1 status.  Less than 24 hours after admission, Patient No. 12 used her hospital gown as a cord, tied it around her neck, and attached it to a faucet.  She was later found nonresponsive in her bathroom.  In September 2009, Patient No. 12 attempted to hang herself at her group home.  She was admitted to Harbor-UCLA Medical Center, where she was placed on 1:1 status.  After transfer from Harbor-UCLA to the Hospital, Patient No. 12 was

25

removed from 1:1 status.  The day after transfer, she was found

hanging in her room, near death, and was rushed to a medical hospital.

Patient No. 12 receives Medi-Cal benefits.  Upon information and

belief, Defendants billed Medi-Cal for 1:1 status for Patient No. 12.

m.   **Patient No. 13 (September 2009):**   In September 2009, Patient No.

13 (a minor) was admitted to the Hospital on an involuntary

psychiatric hold.  Patient No. 13's medical records stated he was very

psychotic and a high flight risk.  Patient No. 13 was <u>not</u> placed on 1:1

status and was unsupervised.  He attempted to escape and was later

found in nearby bushes.  Patient No. 13 was still <u>not</u> placed on 1:1

status and was unsupervised.  This time, Patient No. 13 removed the

screws from his bathroom window and took a city bus to Long Beach.

Patient No. 13 is a Medi-Cal recipient.  Upon information and belief,

Defendants billed Medi-Cal for 1:1 status for Patient No. 13.

n.   **Patient No. 14 (December 31, 2009):**  On December 31, 2009,

Patient No. 14 was medicated against his will despite being

nonviolent and cooperative.  Patient No. 14 was quietly watching

television and eating cereal when a "Show of Force" was called and

he was forced to take medication.  Patients must pose an immediate

threat to themselves or others before they can be medicated against

their will.  Patient No. 14 is a Medi-Cal recipient.

o.   **Patient No. 15 (December 2009):**  On or about December 31, 2009,

Patient No. 15 (a minor) was given access to art supplies.  She then

used the supplies to mutilate her arm.  Dr. Howard Askins ordered 1:1

status to prevent further injury.  Diane Hobbs (Director of Nursing)

overrode Dr. Askins' 1:1 order due to the cost of extra staffing.  Ms.

Hobbs did not inform Dr. Askins.  Patient No. 15 once again gained

access to sharp objects and was found mutilating herself within 35

minutes.  Patient No. 15 is a Medi-Cal recipient.  Upon information

and belief, Defendants billed Medi-Cal for 1:1 status for Patient No.

15.

p.   **Patient No. 16 (January 2010):**   On January 8, 2010, Patient No. 16

complained to staff that her doctor (Dr. Timothy Pylko) spends just a

few minutes with her during treatment sessions.  Patient No. 16 stated

that Dr. Pylko spends most of the time during treatment sessions

texting on his cellular phone.  Upon information and belief,

Defendants bill the United States Government more than $500.00 for

each such session.

28.     Upon information and belief, the examples contained in paragraph 27 demonstrate that Defendants are knowingly presenting or causing to be presented false claims to the United States Government (Medicare and/or Medicaid).

29.     Upon information and belief, the examples contained in paragraph 27 demonstrate that Defendants are knowingly making, using, and/or causing to be made or used false records and/or statements to get their false and fraudulent claims paid by the United States Government (Medicare and/or Medicaid).

30.     Upon information and belief, the example contained in paragraph 27 demonstrates that Defendants are conspiring to defraud the United States Government (Medicare and/or Medicaid) by getting their false and fraudulent claims allowed or paid.

## COUNT I
## (VIOLATIONS OF THE FALSE CLAIMS ACT,
### 31 U.S.C. § 3729 *et sequitur*)

31.     Plaintiffs restate and incorporate herein all previous allegations.

32.     The Federal False Claims Act, 31 U.S.C. § 3729, specifically provides, in part:

(a)(1) that liability exists for any person who knowingly presents, or causes to be presented, to an officer or employee of the United States Government, or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;

(a)(2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;

(a)(3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid.

33. Defendants knowingly presented and/or caused to be presented to the United States Government false or fraudulent claims, records, and statements in order to obtain payment for health care services.

34. Defendants knowingly made, used, and/or caused to be made or used false records and statements in order to get false and fraudulent claims paid and/or approved by the United States Government.

35. Defendants failed to disclose material facts that would have resulted in substantial repayments by Defendants to the United States Government.

36. The United States Government and its fiscal intermediaries did not know and could not reasonably have known that the Defendants submitted false claims, records, and statements.

37. Defendants have utilized false records and/or false statements to get their false or fraudulent claims paid by the United States Government in violation of 31 U.S.C. § 3729(a)(2).

COMPLAINT

38.     As a direct and proximate result of Defendants' false claims, false records, and/or false statements, the United States Government has paid and continues to pay false claims.

39.     As a direct and proximate result of Defendants' false claims, false records, and/or false statements, the United States Government has been damaged and overcharged by millions of dollars.

**COUNT II**
**(FALSE CLAIMS ACT CONSPIRACY**
**[31 U.S.C. § 3729(a)(3)])**

40.     Plaintiffs restate and incorporate herein all previous allegations.

41.     Defendants Soon K. Kim, M.D., Eric Kim, Linda Parks, and P. Blair Stam all have personal knowledge of and involvement in the creation and/or implementation of policies and practices which result in false statements and false claims being presented in violation of 31 U.S.C. §§ 3729 – 3733.

42.     Defendants conspired to get false and fraudulent claims paid or allowed by the United States Government.

43.     Defendants agreed by words and conduct to submit false claims, records, and/or statements for the unlawful purpose of getting false and fraudulent claims paid or allowed by the United States Government. Numerous false claims have been submitted and continue to be submitted to the United States Government in furtherance of the unlawful purpose.

44.     Defendants have taken substantial steps in furtherance of those conspiracies by preparing false claims, records, and/or statements, and by submitting same to the United States Government for payment or approval.

45.     The United States Government was unaware that the Defendants' claims were false and fraudulent and unaware of the conspiracy to get false and fraudulent claims paid or allowed.

46.     As a direct and proximate result of the acts of the Defendants, the United States Government has paid and continues to pay Defendants' false and fraudulent claims.

47.     As a direct and proximate result of the acts of the Defendants, the United States Government has been damaged and overcharged by millions of dollars.

COMPLAINT

## DAMAMGES AND CLAIMS FOR RELIEF

WHEREFORE, Plaintiffs respectfully request judgment and ask for relief as follows:

  a) that Plaintiff USA be awarded judgment against Defendants and each of them, jointly and severally, in such an amount as the evidence may show, for violation of 31 U.S.C. § 3729 including, but not limited to, actual damages proximately caused by Defendants' false and/or fraudulent submission of claims for payment and/or approval;

  b) that Plaintiff USA be awarded judgment against Defendants and each of them, jointly and severally, for civil penalties of not less than five thousand five hundred dollars ($5,500.00) and not more than eleven thousand dollars ($11,000.00) per false claim or act, plus three times the amount of damages which Plaintiff USA sustained as a result of Defendants false and/or fraudulent claims in violation of 31 U.S.C. § 3729 *et sequitur*;

  c) that Plaintiff USA and Qui Tam Plaintiff Ms. Eidson be awarded pre-judgment interest, all costs of court, related expenses, and reasonable attorneys' fees, and that Qui Tam Plaintiff Ms. Eidson be awarded a percentage of all amounts recovered or collected by Plaintiff USA against Defendants in accordance with 31 U.S.C. § 3730; and

d) that Plaintiffs be awarded any and all other and additional relief as this Court may deem just and appropriate.

Dated: February 11, 2010                    McNULTY LAW FIRM


                                        By: _____
                                            Peter J. McNulty, Esq.
                                            McNulty Law Firm
                                            827 Moraga Drive
                                            Los Angeles, CA  90049
                                            Telephone: (310) 471-2707

                                            Kirk D. Tresemer, Esq.
                                            Irwin & Boesen, P.C.
                                            4100 E. Mississippi Ave., Suite 1900
                                            Denver, CO  80246
                                            Telephone: (303) 999-9999

                                            Olu K. Orange, Esq.
                                            Orange Law Offices
                                            Equitable Plaza Tower
                                            3435 Wilshire Blvd., Suite 2900
                                            Los Angeles, CA  90010
                                            Telephone: (213) 736-9900

                                            Colleen Flynn, Esq.
                                            Law Offices of Colleen Flynn
                                            3435 Wilshire Blvd., Suite 2900
                                            Los Angeles, CA  90010
                                            Telephone: (213) 252-0091

COMPLAINT

1

## DEMAND FOR JURY TRIAL

2

Plaintiffs demand trial by jury as to all causes of action.

3

4

Dated: February 11, 2010                    McNULTY LAW FIRM

5

6

7

By: _____

8
    Peter J. McNulty

9
    Attorney for Plaintiffs

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

34

COMPLAINT